DECISION
Before this Court is the appeal of Augustus C. Morelli (Appellant or Gus)[1] in his capacity as executor of the estate of his mother, Mary Guiseppina Morelli (Mrs. Morelli), from an Order of the Barrington Probate Court entered February 3, 2005. Jurisdiction is pursuant to G.L. 1956 § 33-23-1.
 I Facts and Travel
This matter was heard by the Court, sitting without a jury. The following is an overview of the facts in this case. This section addresses the testimony heard and the Court's credibility determinations, and will constitute this Court's findings of fact pursuant to Super. R. Civ. P. 52(a).
Mrs. Morelli executed a will (the Will) on April 6, 1993, devising her net estate in equal shares to her children, per stirpes. Because she intended that her children benefit equally, she summarized the amounts paid to each child as an advancement on their inheritance during her lifetime. These advancements would be taken into account when calculating each child's share. Her summary of advancements was as follows:
 a. Marie Marabello (Marie) : $7000 *Page 2 
 b. Augustus C. Morelli (Gus) : $1500
 c. Paul A. Morelli (Paul) : $2000
 d. Suzanne C. Jordan (Suzanne) : $25,000[2]
 e. Joseph W. Morelli (Joseph) : $4000
Mrs. Morelli appointed her eldest son, Gus, to be the executor of her estate. In this role, Gus was granted the power to sell all real estate and personal estate, make such investments as he deemed proper, borrow or lend as he saw fit, and divide the property among the beneficiaries as instructed by the Will. He was further granted the power to compromise or submit to arbitration any matters in dispute. The validity of the Will has never been challenged by the parties as to form.[3]
Mrs. Morelli died on July 29, 2001, and Gus became executor of the estate. He filed the first universal inventory of the estate on February 15, 2002, valuing Mrs. Morelli's personal assets at $1800.[4] Soon thereafter, family issues and questions regarding Gus' fair dealing as executor began to arise. On January 10, 2002, Gus' brother, Joseph, filed a petition in the Barrington Probate Court to render an inventory or an account of the estate funds.[5] On July 11, 2002, another sibling, Suzanne, filed a petition in Barrington Probate Court requesting that Gus be removed as executor of the estate for having neglected his fiduciary duties. Her motion alleged that Gus' inventory of personal effects neither reflected a true accounting of the assets *Page 3 
nor the accurate values for sale of those items. Another sister, Marie, filed a motion in support of Suzanne's complaint against Gus on July 26, 2002.
These issues were heard by the Probate Court on September 9, 2002, and an Order of that Court was issued September 13, 2002. The Order required Gus to file a First Accounting prior to October 7, 2002, and that Mrs. Morelli's real estate (186 Foote Street in Barrington, Rhode Island) be listed for sale. The Probate Court continued the removal petition at that time.
Subsequently, Gus proposed to his siblings that they accept as accurate an estimated sale price of the house to be $139,000 (a figure developed with the aid of a realtor), and he requested that they each sign general release forms in return for one fifth (1/5) of the estimated value of the property ($25,800 to each sibling). Joseph and Marie signed such general release forms, stating, essentially, that they acknowledged receipt of their one-fifth share of Mrs. Morelli's estate, and released Gus from any further liabilities as executor of the estate.
On October 2, 2002, Joseph filed a petition seeking an accounting of all estate funds. He contended that his general release — which acknowledged his right to no more than a one-fifth share of the estate, less his $4000 lifetime advancement — lacked full effect until Joseph had received his full one-fifth share of all funds to which he was entitled above and beyond the $21,800 he had already received.[6]
Joseph's contended that the share he received did not reflect his entire one-fifth share of the estate, as it was based on Gus's conjecture as to what the final sale amount would be.
Gus filed an inventory on October 3, 2002, listing the personal effects and presenting their value as $2463. Gus further noted that all five children had keys to the house, therefore making it impossible for him to know if any items have been removed. On October 7, 2002, Gus *Page 4 
filed a first account ("First Accounting"), showing a schedule for the value of estate assets sold or appraised (total representing $396,967); a schedule for amounts paid out (representing $11,291.72 in expenses and $260,104 in disbursements to family); and a schedule of amounts still in possession of the fiduciary (representing only the real estate, appraised at $135,000).[7] This First Accounting included both probate and non-probate assets. At a hearing held the same day, Gus stated that he would purchase the property for $185,000. For reasons that were not expounded upon in the record, he did not purchase the real estate at that time.
On October 11, 2002, the Probate Court issued an Order requiring,inter alia, that no sale of the house be made unless all five beneficiaries agree, or the sale is approved by the court; that Gus, as executor, communicate with his siblings only through an attorney; and that should the net funds exceed those used to calculate Joseph's share, Joseph would be entitled to his proportionate share of the additional funds.
On October 22, 2002, Marie filed a petition to compel sale, contending that Gus had stated in open Court that he would purchase the property, and after a year on the real estate market, there existed no higher offer. On December 31, 2002, Marie and Joseph filed a joint memorandum in support of Marie's previously filed petition. In the alternative, they sought the Court to order the property be placed back on the market without any rights of first refusal, should Gus choose not to purchase the property.
On January 10, 2003, the Probate Court entered an Order requiring that the property be listed for $210,000, and that Gus obtain a letter from both Residential Properties LTD and Coleman Realtors indicating whether or not either would agree to a 5% commission rate.[8] The *Page 5 
Order further stated that Gus could not retain a right of first refusal and that any purchase and sale agreement was subject to the approval of the Probate Court.
The Probate Court issued another Order on January 16, 2003, finding that both realtors submitted the same percentage for commission (6%), and ordering that the house be listed with Coleman Realtors, because the last (unsuccessful) listing was with Residential Properties.
Subsequently, an offer was made on the property for $170,000. The Probate Court ordered that the offer be accepted, but that the property remain on the market at $185,000 until the prospective buyers were able to obtain mortgage financing. This sale fell through due to problems with the house which were revealed upon inspection. The Probate Court further ordered that all offers received by Gus be communicated to all interested parties within forty-eight hours of receipt.
On July 2, 2003, Suzanne — represented by her husband, Thomas Jordan, as her buyer's agent — submitted an offer on the property for $175,000 and waived several inspections and contingencies. Gus and Paul objected to the sale by letters, contending that the property, if improved with a small investment of $10,000, would be worth $250,000. After a hearing on October 16, 2003, the Probate Court ordered ("October 23, 2003 Order") that the sale to Suzanne be consummated on November 3, 2003, unless any of the heirs desirous of purchasing the property for $240,000 (the alleged value less the amount of necessary repairs) without contingencies immediately forward their offers and proof of financing.
In the October 23, 2003 Order, the Probate Court summarized the events pertaining to the real estate. The Probate Court noted that the initial appraised value of the property was $135,000; that the property was listed for sale with Residential Properties of Barrington for $199,000, subject to Gus's right of first refusal; and that the numerous attempts that were made *Page 6 
to sell the property resulted in only one written offer to purchase for $170,000, which was not consummated. The Court further noted that Gus represented that he would purchase the property for $185,000, but failed to do so; that the property was re-listed with Coleman Properties at $210,000 (later reduced to $185,000); and that an offer was made for $173,000 subject to conveyance contingencies, but was withdrawn upon inspection and discovery that $30,000 to $40,000 worth of termite damage afflicted the building. Suzanne's offer of $175,000 was made shortly thereafter. The Probate Court stated that although Gus and Paul objected to the sale to Suzanne and requested that the property be placed on the market again after repairs, neither were willing to purchase the property for $240,000 at that time.
As a result of this Order, Gus filed a Claim of Appeal on October 30, 2003, requesting that the matter be stayed until it could be heard by the Superior Court. His request was denied by an Order of the Probate Court on November 4, 2003. Gus filed an appeal in Superior Court on November 7, 2003. As a result, the Probate Court no longer had jurisdiction in connection with the sale of the house.
On June 9, 2004, Suzanne filed a petition requesting the Probate Court to compel Gus to rent the property at 186 Foote Street at fair market rental to offset the mounting costs to the estate for the delay in sale of the property, caused by Gus's refusal to sign for the sale of the property to Suzanne. The petition further requested that Gus be compelled to treat an active termite infestation in the house to prevent further deterioration of the property. In a letter to the Probate Court Judge on July 12, 2004, Gus indicated that he was in the process of repairing the home, and would rent the property as soon as repairs were complete.
Gus made an offer to purchase the property on August 19, 2004, for $240,000, and submitted a memorandum indicating that he would not pursue the appeal then pending in *Page 7 
Superior Court. On September 27, 2004, the Probate Court ordered the sale to Gus (September 27, 2004 Order), stating that it was in the best interest of the estate, as it would generate an additional $65,000 for the estate. The order further required that if the sale to Gus was not consummated, the property should be sold to Suzanne as soon as practicable.
The sale to Gus was, in fact, consummated, and the additional $65,000 proceeds were placed in escrow to be held until the appeal period ran on the September 27, 2004 Order. On November 23, 2004, Coleman Realtors sent a letter to Gus seeking to be compensated for 6% of the sale. Coleman Realtors contended that they had entered into an exclusive right-to-sell listing agreement with Gus, pursuant to the Probate Court's Order, on January 10, 2003, and that they had continued to advertise the property until they were informed by Mr. Jordan that the property had been sold to Gus. They averred that although their services did not result in the final sale, they were owed compensation for retaining a ready and willing purchaser at a price approved by the Probate Court.
On November 7, 2004, Joseph and Suzanne filed an objection to Gus's Proposed First and Final Accounting, contending that it was difficult to ascertain from the accounting the essential elements (funds received, funds paid out, and remaining balance). They also maintained that there were numerous errors in the amounts cited, resulting in nearly $50,000 in unaccounted for funds. The Probate Court held a hearing on December 14, 2004, on the First and Final Account for the estate, and on the claim for commission by Coleman Realtors.
On January 12, 2005, Gus filed a Second Proposed First and Final Accounting (the "Second Accounting"). This document was signed by the Estate's attorney, James Sullivan, and summarized the estate account as receiving $280,975.78 total. However, in addition to the summarized total, the Second Accounting included an inventory prepared by Gus which itemized *Page 8 
the assets received, as totaling only $241,475.78. The Second Accounting showed the estate paying out $51,259.21 in debts and distributions to family members. On the summarized schedule, this deduction left the account balance at $229,716.57. However, using the number on the itemized sheet of assets ($241,495.78), the total remaining was $190,216.57.
On January 19, 2005, Joseph and Suzanne filed an objection to Gus's Second Proposed First and Final Accounting. They objected, interalia, to Gus's representation that Suzanne's debt to the estate should be $40,000. They further objected to Gus's representation that Joseph was due no additional funds based upon his prior release. Joseph and Suzanne also contended that the Schedule had listed expenses that should have been paid by the executor in his individual capacity and not by the estate; that it listed as receivable several items that were not property of the estate; and that the Schedule failed to account for $56,386.64. They further contended that, once additional distributions made to Joseph and Marie are deducted, the final unaccounted for amount totals $40,100.02. They aver that this amount remains in the hands of the executor. Finally, Suzanne and Joseph moved to have Gus removed from his position as executor.
On February 3, 2005, the Probate Court released an Order addressing these complaints (February 3, 2005 Order). The Court made the following determinations:
 • Suzanne's debt to the estate is $25,000 (not $40,000), because objections to the Will had been waived.
 • Coleman Realtors should be paid $10,500, representing a six percent (6%) commission as set forth in its contract.
 • The estate shall pay expenses and attorney fees of Suzanne Jordan in the amount of $5215. *Page 9 
 • That the loan to Edward Paul (listed as receivable by the estate) did not constitute debt owed to the estate.
 • Joseph Morelli shall receive his pro rata 1/5 distributive share of excess funds.
 • Attorney's fees to James Sullivan in the amount of $11,000 shall be paid, but are capped at that amount. Any additional time necessary to close the estate shall not be charged to the estate.
 • Gus Morelli's fiduciary fees in the amount of $2350 are allowed, but capped at that amount. This amount represents a 50% reduction in the amount requested.
 • A First and Final Account incorporating the directives of the Order is required on or before February 9, 2005, and all funds shall be distributed to the estate beneficiaries on February 16, 2005.
 • Gus Morelli shall turn over all estate funds in his possession to James Sullivan. Attorney Sullivan shall deposit said funds in an interest-bearing account on behalf of the estate.
The Court denied the Motion to Remove Gus as executor provided that every provision of the Order was carried out. The foregoing determinations are at issue in this appeal.
On February 11, 2005, Gus filed a Claim of Appeal in this Court alleging, inter alia, that there is no evidence to support the finding that Suzanne Jordan's debt to the estate was $25,000 and not $40,000; that the evidence did not warrant a finding that Coleman Realtors should be paid a 6% commission; that Joseph's release ended his claim to any additional estate funds; and that the Probate Court was in error in awarding expenses and attorney fees to Suzanne Jordan. As relief, he seeks this Court to reverse the entire February 3, 2005 Order. *Page 10 
This Court conducted a trial on this matter on December 5, 2007. At trial, this Court heard the testimony of Gus Morelli, Attorney James Sullivan (the attorney for the estate), and Mr. Jordan, the buyer's agent for the sale of Mrs. Morelli's real property to Suzanne.
Gus testified generally with respect to his actions as the executor of Mrs. Morelli's estate. He was not credible. He was a disingenuous witness, vacillating in his testimony, and unclear in his explanations. Gus testified incorrectly that the real estate was the only item to probate (in conflict with his own inventory of assets); he testified that he had planned and attempted to "pay everybody off" prior to the liquidation of assets based upon an estimated amount. He testified that he found it frustrating that his siblings would not agree to those terms and that they continued to seek more money. He testified that he paid certain initial amounts to Joseph and Marie out of his own pocket, and planned to reimburse himself from the proceeds obtained through the sale of the real estate. Gus admitted that he never opened a separate account for the estate funds and that he freely borrowed from the estate as he deemed fit to pay expenses. He further admitted that he personally borrowed funds to make a downpayment on the real estate that he ultimately purchased. Gus testified vehemently that he believed Marie and Joseph were entitled to no additional funds, as they had settled their claims. He further testified that he believed Suzanne owed $40,000 and not $25,000, because it would be unfair for the other siblings to suffer a reduced inheritance as a result of her additional advancements from Mrs. Morelli.
Finally, Gus stated that he personally had prepared the inventory schedules that were used for the First Accounting and the Second Accounting. He contended that his lists were accurate, but could offer no explanation for the approximate $40,000 inconsistency between the summary and the asset list. He stated simply that it was a "dilemma;" a "phantom amount of *Page 11 
money that is not accounted for in the inventory." Gus's bitterness over the demands of his siblings, and his sense of entitlement to the proceeds of the estate were evident. Although the Court finds that Gus's confusion regarding the specifics of handling the estate were genuine, the Court nonetheless believes that he perceived an advantage (though even he, perhaps, cannot account for it), and that he sought to exercise his control as executor to maintain this benefit. The current state of the account, by evidence and Gus's testimony, is that it contains $91,147.14, and has been frozen to avoid any further liquidation.
Attorney James Sullivan, a trusts and estates lawyer with 35 years experience, testified as to the considerable inconsistencies in the accountings in this case. The Court finds Attorney Sullivan to be both qualified and credible as a witness with respect to matters concerning the estate. Attorney Sullivan commented that the accountings were prepared by Gus, and that he had signed and approved them based upon information he received from Gus. The First Accounting filed in this case listed the value of the assets of the estate as $396,967.00. At trial, Attorney Sullivan explained that the First Accounting included both probate and non-probate assets. The non-probate assets were not intended to be submitted to the Probate Court, as they were not appropriate for distribution under the Will. Attorney Sullivan testified that these non-probate assets were included in this initial accounting because of the family unrest regarding the estate and the resulting shares. He testified that these items would not have been included but for the animosity that had arisen between the siblings in this family.
When questioned regarding the Second Accounting, Attorney Sullivan was directed to the inconsistencies with regard to the summary sheet and the inventory for estate assets received. He agreed that the summary indicated $280,975.78, but that the inventory totaled the significantly lower amount of $241,475.78 (presenting a difference of $39,500). He could not *Page 12 
recall for the Court whether the summary had included the advancements or loans, or whether this merely added together the assets received and the assets paid out.[9] He stated that he knew of nothing amiss in the inventory calculations, and in this Court's determination, any oversight on his part regarding the inconsistencies at the time the Second Accounting was filed was inadvertent. However, Attorney Sullivan agreed that all of the loans that were indicated as advancements in the Will were deducted and memorialized in the Second Accounting's list of what was owed to each sibling. He further agreed that if the loans were subtracted from each of the heirs' shares, then the difference would go back into the residue of the estate.
The Court finds by observing the Will and applying simple arithmetic that the amount missing would be $39,500;[10] the exact difference between the final summary and the inventory. Upon review of the inventory submitted in conjunction with the Second Account, this Court finds that the advancements were deducted from the siblings' shares without having been accounted for as probate assets. This resulted in the inconsistencies between the total amount signed off by Attorney Sullivan, and the inventory amount prepared by Gus.
Finally, Mr. Jordan testified that he had worked as a co-broker for the sale of Mrs. Morelli's property. He worked for Masassoit Realty, and had submitted Suzanne's offer to purchase the property for $175,000 in 2003, while the house was listed with Coleman Realtors. He testified credibly that Coleman Realtors agreed to pay his company 3% of the net sale once they had received their agreed upon 6% commission. He admitted that the property was never actually transferred to Suzanne, despite the October 13, 2003 Order of the Probate Court commanding such sale in the event that no other heir came forward to purchase the property for *Page 13 
$240,000. He testified that Gus refused to sign the purchase and sale agreement on behalf of the estate, and that Gus later offered $240,000 to purchase the property. Mr. Jordan testified that the offer for $240,000 was made during the listing agreement with Coleman Realtors. It is Mr. Jordan's position that as co-broker of the estate, he is entitled to 3% commission on the property, or half of the $10,500 claimed as commission owed to Coleman Realtors (the commission percentage is based on a $175,000 sale price, and not $240,000).
Before the close of trial, the Court was informed that while there were adjustments to be made in all of the beneficiaries' gifts, Suzanne remained the only one to have received no pay out. The parties then agreed that $13,043.31 should be paid to Suzanne — an amount representing the minimum she is entitled to from the estate. The Court ordered the release of said funds and reserved the remaining issues for this Decision.
 II Standard of Review
The Rhode Island General Laws provide that "[a]ny person aggrieved by an order or decree of a probate court . . . may, unless provisions be made to the contrary, appeal to the superior court." G.L. 1956 § 33-23-1(a). In hearing probate appeals, "the Superior Court is not a court of review of assigned errors of the probate judge, but is rather a court for retrial of the case de novo." In re Estate of Paroda,845 A.2d 1012, 1017 (R.I. 2004); G.L. 1956 § 33-23-1(d).
In a non-jury trial, the standard of review is governed by Rule 52(a) of the Rhode Island Superior Court Rules of Civil Procedure. The Rule provides that "in all actions tried upon the facts without a jury . . . the court shall find the facts specifically and state separately its conclusions of law thereon. . . ." Accordingly, the "trial justice sits as the trier of fact as well as of law." Hood v. Hawkins, 478 A.2d 181,184 (R.I. 1984). It is the province of the trial justice, when sitting without a jury, to weigh and consider the evidence, pass upon the credibility of the *Page 14 
witnesses, and draw inferences from the testimony presented. Seeid. The assessments of the trial justice "traditionally [accord] a great deal of respect . . . [because it is] the judicial officer who actually observe[s] the human drama that is part and parcel of every trial and who has had the opportunity to appraise witness demeanor and to take into account other realities that cannot be grasped from a reading of a cold record." In the Matter of the Dissolution of Anderson, Zangari Bossian, 888 A.2d 973, 975 (R.I. 2006).
The trial justice must make specific findings of fact and conclusions of law; however, "brief findings will suffice as long as they address and resolve the controlling factual and legal issues." White v. LeClerc, 468 A.2d 289, 290 (R.I. 1983); Super. R. Civ. P. 52(a). The Rhode Island Supreme Court has found that these findings generally "will not be disturbed absent a showing that the trial justice overlooked or misconceived material evidence or was otherwise clearly wrong."Greensleeves, Inc. v. Smiley, 942 A.2d 284, 289 (R.I. 2007).
 III Analysis
The siblings contend post-trial that Gus is collaterally estopped from raising any substantive issues, because none were specifically stated in Appellant's Claim of Appeal as a "reason of appeal." Section 33-23-1 of the General Laws requires that the "reasons of appeal [be] specifically stated." The Court notes that Gus's claim states as reasons for appeal that the February 3, 2005 Order of the Probate Court is against the law and the evidence and that it fails to do substantial justice between the parties. These reasons are quite general. However, Gus's Claim of Appeal incorporates specific requests with regard to the February 3, 2005 Order, and he timely filed appropriate portions of the Probate Court record as to several of the requests contained therein. *Page 15 
The issue of whether an appeal is timely is jurisdictional; consequently, this Court is barred from considering the issues that fail to meet the requirements of § 33-23-1. See Griggs v. Estate ofGriggs, 845 A.2d 1006, 1009 (R.I. 2004). However, "[a]s long as the appellant makes a timely and good faith effort to supply those portions of the Probate Court record . . . that are sufficient to enable the reviewing court to pass on the issues . . . the appeal should not be dismissed." Estate of Hart v. LeBlanc, 853 A.2d 1217, 1219 n. 1 (R.I. 2004). Gus has made a timely and good faith effort to supply the necessary materials to this Court with respect to the following issues: 1) the amount of Suzanne's advancement under the Will; 2) the effect of Joseph's general waiver; 3) whether certain sums of money given by Mrs. Morelli constituted advancements, loans, or gifts; 4) the amount of estate assets, and 5) Coleman Realtors' and Mr. Jordan's alleged right to commission as real estate agents. These issues will be reviewedde novo. See In re Estate of Paroda, 845 A.2d at 1017; G.L. 1956 § 33-23-1(d) (the Superior Court's review of Probate Court determinations is de novo).
In addition to the aforementioned issues, Gus included in his Claim of Appeal the following requests: that Suzanne's award of attorney's fees and costs be reversed; that Gus be reimbursed for all expenses he incurred as executor of the estate; that Gus be granted an amount as a fiduciary fee double to that awarded by the Probate Court; and that the Probate Court's February 3, 2005 Order be reversed in its entirety. This Court has considered the Claim of Appeal, has reviewed the record, and has considered all evidence entered at trial. The foregoing requests were not properly raised because no reasons were proffered to support these claims, and no record, evidence, or arguments were presented that would allow this Court to pass on these issues. Section 33-23-1;Estate of Hart, 853 A.2d at 1219 n. 1. Therefore, the Court will only address the matters properly raised and presented. *Page 16 
 A The Amount of Suzanne's Advancement Under the Will
At trial, Gus's counsel contended that this Court should reconsider the validity of Mrs. Morelli's handwritten modification of her Will. On the face of the Will, a strike mark was made through the number $40,000 where Suzanne's advancement was delineated, and was replaced with $25,000, written by hand. By Order of the Probate Court and over no asserted objection, the Will with this modification was deemed valid. At trial, Gus contended that this Court reviews appeals from the Probate Court de novo, and, therefore, the validity of this modification could be revisited. Counsel for the Apellees averred that all objections to the Will were waived by the time the Will was admitted to probate (September 10, 2001), and that the Will with the modification should stand.
At trial, this Court ruled on the record that any objections to the Will were untimely, as the Will was submitted for probate without objection, and no timely appeal was filed after the Probate Court's determination on September 10, 2001, that the Will was valid. Section 33-23-1 (granting a person aggrieved by an order or decree of the Probate Court 30 days to file appeal in Superior Court); 79 Am. Jur. 2dWills § 767 (2002) ("[i]f no direct proceeding is brought to contest a will within the statutorily proscribed time period, the validity of the will is established for all purposes"); see generally State v.Russell, 950 A.2d 418, 431-432 (R.I. 2008) (finding that, as a general matter, the "raise-or-waive" rule precludes the reviewing Court from considering an argument not previously articulated). Under § 33-7-23 of the General Laws, "[t]he final probate of a will by the probate court, or on appeal, shall be conclusive as to its execution." *Page 17 
The Probate Court's determination on September 10, 2001, therefore provides conclusive evidence of the Will's execution. Although Gus maintained in his trial testimony — given after this Court's decision on the validity of the Will — that Suzanne owed $40,000 and not $25,000, this issue was conceded in the post-trial memorandum submitted by Gus's counsel. For these reasons, this Court will proceed with the remaining issues, using $25,000 as the amount of the advancement to Suzanne under the Will.
 B The Effect of Joseph's Waiver
At trial, Gus contended that Joseph signed a release that was unambiguous, and that it had the effect of forever discharging his claims and demands against the executor and the estate. The siblings disagreed, contending that Joseph's releases applied to a general portion of the residue of the estate, but not as to a specific dollar amount. In the release, Joseph agreed to forfeit any further claim in exchange for one-fifth (1/5) of the residue, reduced by his lifetime advancement. The siblings averred that as long as the residue was undetermined, Joseph is not foreclosed from claiming the remainder of his share. As evidence at trial, the siblings submitted the October 11, 2002 Order of the Probate Court indicating that additional or excess funds should be distributed to Joseph to fulfill his one-fifth share.
In general, "[f]amily compromise agreements when there are no elements of fraud or overreaching are favored even though final results may be different from those anticipated. . . . This is particularly true where all parties thereto have the same knowledge or means of knowledge of the facts." McGinn v. McGinn, 50 R.I. 236, 239 (R.I. 1929). However, where the agreement is predicated upon a representation of facts that are untrue, the agreement may be vitiated. Id. at 240. In this case, this Court finds from the inconsistencies evident in the First *Page 18 
and Second Accountings submitted by Gus that he either misunderstood or misrepresented the amount due to each of the heirs. Joseph's waiver states that:
 ". . . for the following consideration paid to me by Gus C. Morelli, Executor, in the above named estate acknowledge receipt thereof: one-fifth of the tangible personal property and one-fifth of the residue reduced by the lifetime advancement, I do hereby release and forever discharge the said fiduciary and his/her sureties, heirs and personal representatives from all debts, demands, actions and liabilities whatsoever, which against the said fiduciary I now have, or ever had for or on account of the estate of Mary Guiseppina Morelli a/k/a Josephine M. Morelli."
The language of this waiver is unambiguous on its face.[11] It required Gus to relinquish one-fifth of the estate to Joseph. The effect of this waiver is to release a claim for assets beyond Joseph's one-fifth share, less his advancement. It does not state a sum certain, and it does not limit the amount of that share. Without a consistent, agreed upon accounting and inventory, the estate residue from which the shares would be calculated is unknown. The Court finds that Joseph was paid some amount of money intended by Gus to represent his full one-fifth share. However, this amount was based solely on Gus's low-ball conjecture of the total estate residue.
The Court concludes that Joseph is entitled to his full one-fifth share, less the advancement stated in the Will. If said share is more than what Joseph has received thus far, he should be paid that additional amount. *Page 19 
 C Whether the Loans Listed as Receivable in Gus's Accounting Were Debts to the Estate
In his Final Accounting, Gus listed several sums of money as "loans" to family members and receivables of the estate. His argument at trial indicated that these amounts might alternatively be considered advancements. The siblings argued at trial that the Will clearly delineated the amounts to each child that Mrs. Morelli intended to be treated as advancements, and so these additional amounts, one for $5000, and one for $10,000, which were not listed in Mrs. Morelli's Will, were not advancements and not debts to the estate. Rather, they asserted that these amounts constituted gifts from Mrs. Morelli.
Advancements and loans are distinguished from one another in the probate law, and should be treated separately. See Hayes v.Welling, 38 R.I. 553, 562 (R.I. 1916). An advancement is a gift given during the testator's lifetime that is intended by the grantor to represent a payment on an inheritance in advance of the grantor's death. 80 Am. Jur. 2d Wills § 1479. This amount is deducted from the grantee's share of the estate. G.L. 1956 § 33-1-11. In determining whether a certain amount was intended as an advancement, there must be specific evidence of the testator's intent. Id. As a rule of will construction, if the language of a will is clear, unambiguous, and positive, the Court will take the language to reflect the testator's intent and make determinations accordingly. See Lancellotti v. Lancellotti,119 R.I. 184, 190-191 (R.I. 1977). However, where the will is ambiguous, it is the obligation of the Court to determine "the dispositive intent by considering the instrument in its entirety and also by taking into consideration the circumstances surrounding its formulation."Id. at 189.
With respect to the advancements in Mrs. Morelli's Will, this Court finds that the language of the Will was clear and unambiguous. Mrs. Morelli's Will states "there shall be charged against each [child] such share the following amounts which were advanced to each *Page 20 
respective child during my lifetime. . . ." The Will then lists the name of each child and a specific sum representing the advancement amount. The Court finds that this language clearly establishes that Mrs. Morelli intended these gifts to be treated as advancements. The debts to the estate that Gus references are not listed in the Will.
The fact that advancements are delineated in a will does not necessarily foreclose the possibility that additional advancements were made after the execution of the will. See Hayes, 38 R.I. at 562. However, to be considered an advancement, the gift must meet the following statutory requirement: "[i]f real estate shall be conveyed by deed of gift, or personal estate shall be delivered to a child or grandchild, and charged, or a memorandum made thereof in writing by the intestate or by his or her order, or shall be delivered expressly for that purpose in the presence of two (2) witnesses, who were requested to take notice thereof, the real estate or personal estate shall be deemed an advancement to the child to the value of the real or personal estate." G.L. 1956 § 33-1-11. Here, Gus has offered no evidence to show that these amounts were recorded either in a writing and charged, or that they were delivered in the presence of two witnesses who were asked to take notice. Absent such evidence, the Court cannot conclude that Mrs. Morelli intended these sums to be advancements. See Mowry v.Smith, 5 R.I. 255, 259-260 (R.I. 1858).
If, in fact, the amounts Gus alleges are owed to the estate, they would be as loans and not as advancements. See Hayes, 38 R.I. at 562. Gus presented no evidence beyond his own testimony to support a finding that such loans existed. Gus's testimony clearly indicated that he believed the money given to his siblings was inequitable, and stated that he had based his assumption regarding the alleged loans on his personal knowledge of amounts borrowed for the college education of his siblings' children. Gus offered nothing to support a finding with regard *Page 21 
to Mrs. Morelli's intent. Rather, he simply stated that he felt the treatment of these amounts as gifts rather than loans or advancements would be "unfair."
The Court finds Gus's testimony on this issue to be self-serving and unreliable. In the utter absence of any corroborating evidence with respect to the existence of these loans, the Court concludes that the alleged loans are not owed to the estate, and that, in fact, they constituted gifts.
 D Amount of Estate Assets
Gus next requested the Court to find the total estate assets amounted to $241,475.78. In Gus's Second Accounting, there are two separate numbers purporting to represent the total assets of the estate. One, in a summary prepared by Attorney Sullivan, stated that the estate assets totaled $280,975.78. The other, however, in the inventory sheets prepared by Gus, reported that the assets totaled only $241,475.78.
Gus's inventory comprised of three schedules: Schedule A, showing assets of the estate (totaling, again, $241,475.78); Schedule B, showing payments, charges and distributions (this number is consistent with Attorney Sullivan's summary and is $51,259.21); and Schedule C, containing the items of property in the fiduciary's possession (this schedule shows $51,259.21 deducted from $241,475.78, and distributes the remainder to the siblings less each sibling's advancement under the Will).[12]
At trial, Attorney Sullivan admitted that an inconsistency existed between his summary and Gus's "Schedule A" inventory sheet; however, he could not recall for the Court whether the summary included the advancements, or what else may have been amiss in the calculations. He *Page 22 
agreed, however, that all advancements in the Will were deducted from the proposed shares in Schedule C, and that in general, advancements must be counted as part of the residue of the estate.
Upon review of the inventory submitted in conjunction with the Second Account, this Court finds that the advancements were deducted from the siblings' shares without having been accounted for as probate assets. This resulted in the inconsistencies between the total amount signed off by Attorney Sullivan, and the inventory amount prepared by Gus.
With respect to calculating the estate distribution and factoring in advancements, the General Laws require that "[i]f any child or grandchild of an intestate shall have received from him or her any real or personal estate for his or her advancement, the probate court shall ascertain the amount thereof before appointing commissioners to divide the real estate, and shall, in its decree of division, direct the commissioners to deduct the amount thereof from the share of the child or grandchild." Section 33-3-4. The Court observes that Attorney Sullivan's calculation of the assets applies the traditional hotchpot method, which adds the amount of advancements to the estate funds before dividing the property.[13] Gus's inventory does not add the advancements as estate assets, but does deduct the respective shares.
Rhode Island's statute regarding advancements has long been understood to abrogate the hotchpot method in favor of deducting the advancements from the heirs shares based upon the reduced estate value. Law v.Smith, 2 R.I. 244, 250 (R.I. 1852). Under this method, the *Page 23 
advancements would not be added into the estate total before dividing the estate into shares. Therefore, assuming, arguendo, that Gus's calculation of the liquidated estate assets was accurate, the total would be $241,475.78, and the $39,500 would not be added to the estate assets before making the division. Under this method, and assuming,arguendo, that Gus's inventory is accurate, Schedule C of the inventory correctly deducted the advancements from the respective heirs' shares out of the $241,475.78. However, once this calculation is made, there remains an additional amount left in the fiduciary's account because it was deducted from the shares. This additional amount should be considered residue of the estate and distributed accordingly.[14]
Although Gus was correct in not adding the advancement amounts at the onset, he has not accounted for the additional amount that should be in the estate's account. Gus's trial testimony indicated that he believed anything left in the account should go to him. Without adding the amount from the advancements back into the residue of the estate, the estate will have $39,500 in excess. This is not, as Gus's trial testimony suggested, a "phantom" amount. This amount belongs to the heirs in equal shares, and not solely to Gus.
The Court has found Gus's testimony with regard to the estate assets and his calculations of the shares to be unreliable; consequently, issues regarding which siblings have been paid what amount remains unresolved. Therefore, this Court remands the matter to the Probate Court for further accounting — particularly with regard to the estate assets, the amounts already paid to the siblings, and the residue of the estate after the advancements are deducted — and distribution consistent with this Decision. *Page 24 
 E Coleman Realtor's and Thomas Jordan's Entitlement to Real Estate Commission
Finally, Gus contends that there exist no viable claims for real estate commissions, as there were no written agreements to that effect. Gus argues that under the Statute of Frauds, any agreement for commission must be in writing. He states that because there was no such agreement, and because he ultimately purchased the house himself without the aid of any realtor, no commissions are owed.
The Probate Court's February 3, 2005 Order states that payment in the amount of $10,500.00 representing 6% commission is owed to Coleman Realtors. The Appellees contend that additionally, Mr. Jordan is owed 3% commission because he acted as the buyer's agent for Suzanne. In his trial testimony, Mr. Jordan agreed that the sale of real estate to Suzanne was never consummated, however, he contended that because he served as the cooperating agent for the sale of the property, Gus's interference with the transaction to Suzanne should not eliminate his ability to collect commission on the originally intended sale. In Rhode Island, "the Statute of Frauds requires that an individual seeking the payment of a commission in connection with the sale of real estate is denied recovery, unless the agreement is documented in writing."Brochu v. Santis, 939 A.2d 449, 453 R.I. 2008. Furthermore, any arguments in quantum meruit or promissory estoppel, which would take the agreement out of the statute, would, absent fraud, defeat the purpose of the statute. Id. at 454 (stating that an "oral agreement precludes recovery of a commission `irrespective of whether the action is based on the contract, on quantum meruit for services rendered, or on a theory of estoppel.'") (Citations omitted.)
Here, there was a written contract with Coleman Realtors for the exclusive right to sell Mrs. Morelli's property (186 Foote Street), between January 10, 2003 and April 15, 2003. The *Page 25 
contract was entered into evidence and reviewed by this Court. The written contract with Coleman Realtors was made pursuant to the Probate Court Order on January 16, 2003, which ordered that Mrs. Morelli's house be listed with Coleman Realtors, because it offered the same commission rate as Residential Properties and because the last (unsuccessful) listing was with Residential Properties. The contract states in pertinent part: "[i]n consideration of Broker submitting this listing and corresponding photo(s) to State-Wide Multiple Listing Service, Inc. (and . . . Broker's efforts to procure a purchaser of subject real estate, I, the undersigned ("Seller") hereby employ[s] and grant[s] above mentioned Brokerage Firm (Broker) the exclusive right, revocable only with Broker's consent . . . to sell or exchange the real property. . . ."
While this agreement was in effect, Coleman presented to Gus a total of six offers to purchase. The last of these offers was the one made by Suzanne, with Mr. Jordan acting as the cooperating realtor. The Probate Court's October 23, 2003 Order approved this sale, and ordered that the sale be consummated unless any of the other heirs made an offer to purchase the property for $240,000. Although there existed a purchase and sale agreement between Gus and Suzanne, the sale was never consummated due to Gus's delaying the transaction and appealing the October 23, 2003 Probate Court Order requiring the sale. When Gus ultimately purchased the property in September 2004, the agreement for the exclusive right to sale had expired, and the purchase and sale agreement was effectively voided by the Probate Court's acceptance of Gus's higher offer. Therefore, there was no written contract with any realtor in effect at the time the ultimate sale was made. Despite this fact, however, the evidence supports a finding that Gus's delay and appeal of the agreement to sell to Suzanne interfered with Coleman Realtors' right to commission on that sale. *Page 26 
Under an agreement for exclusive right to sell, the owner is not obligated to sell, and no assurances are made that any conveyance will occur. 4 Corbin on Contracts, Interests in Land § 17.17 (2005). However, "[w]hat the promise really signifies is a duty of the owner-principal to the agent to refrain from causing the failure of a condition to the latter's right to commission . . .; [t]hus, if the owner refuses to convey to a buyer ready, willing and able to purchase on agreed terms, the failed condition of the conveyance is excused, rendering the owner liable to the broker for damages." Id.; Restatement 2nd Agency § 445;see also Tristram's Landing, Inc. v. Wait, 367 Mass. 622, 629 (Mass. 1975) (stating, "[i]f the contract is not consummated because of lack of financial ability of the buyer to perform or because of any other default of his . . . there is no right to commission against the seller. . . . [but] if the failure of completion of the contract results from the wrongful act or interference of the seller, the broker's claim is valid and must be paid").
Here, the record reveals that Suzanne was a ready, willing and able buyer; her purchase of the property was approved by the Probate Court; and there was a signed purchase and sale agreement. All of these events occurred while the estate was under contract with Coleman Realtors to sell the property. The record from the Probate Court indicates that Coleman Realtors continued to advertise the property and to relay offers to Gus during the time when Gus, himself, made his offer on the property. Gus's appeal and subsequent offer ended Suzanne's interest in the property. During this period, Gus allowed the contract with Coleman Realtors to expire, and never informed it of his intent to purchase the property for himself. A letter from Coleman Realtors was entered into evidence stating that the company learned of the subsequent sale through Mr. Jordan. This evidence supports a finding that Gus interfered with the sale for his own personal gain. Because Coleman Realtors has proven that the failure to complete the *Page 27 
transaction between the buyer and the seller resulted from the wrongful act or interference of the seller, it is entitled to payment from the seller. See Brochu, 939 A.2d at 453; MacGregor v. Labute,14 Mass. App. Ct. 203, 204-205 (Mass.App.Ct. 1982).
With respect to Mr. Jordan, the Court found his testimony credible, but cannot find that a written agreement existed that would effectively bind Gus to pay Mr. Jordan's commission. If Mr. Jordan had a written agreement, it was with Coleman Realtors. According to Mr. Jordan's testimony, he agreed with Coleman Realtors to co-broker the sale of the property to Suzanne. Under this arrangement, each would take 3% of the sale. The contract between Mr. Jordan and Coleman Realtors was not produced into evidence. It is not the prerogative of this Court to speculate as to the terms of the agreement Mr. Jordan had with Coleman Realtors. Any action Mr. Jordan might have to recover the commission would be against Coleman Realtors and not the estate. Consequently, this Court concludes that he is not entitled to any commission from the estate.
 IV Conclusion
At the center of this case is a long, bitter sibling dispute which has resulted in a lengthy record in Probate Court, and many unresolvable issues in this Court. Gus's actions as executor of Mrs. Morelli's estate, while not entirely unlawful, exhibit jealousy, control, and potential self-dealing. Upon de novo review of the properly appealed issues, and pursuant to Super. R. Civ. P. 58, this Court orders the following:
 1. Suzanne Jordan's advancement under the Will of Mary Guiseppina Morelli is $25,000, and that all challenges to the validity of the Will as probated are hereinafter barred as untimely. *Page 28 
 2. Joseph Morelli is entitled to his complete one-fifth share, less the advancement stated in the Will. If said share is more than what Joseph has received thus far, he shall be paid the additional amount.
 3. The alleged loans for $5000 and $10,000 are gifts, and therefore not owed to the estate.
 4. Coleman Realtors is entitled to $10,500 representing 6% commission on the unconsummated sale of the property to Suzanne.
 5. Mr. Jordan is not entitled to recover commission from the estate.
 6. The case is remanded to the Probate Court for final determination of the estate assets and for distribution consistent with this Decision.
Counsel shall submit the appropriate order for entry.
[1] First names are used throughout this Decision for purposes of clarity. No disrespect to the parties or individuals is intended.
[2] In the Will that was admitted to Probate, the number $25,000 is written by hand next to a strike-out of the term $40,000. The issue of which amount was intended by Mrs. Morelli was a subject of dispute in this case.
[3] The advancement amount to Suzanne Jordan was challenged with respect to the effect of the handwritten edit, and not as to the validity of the Will as a whole.
[4] This inventory listed only two personal effects, household furnishings and a 1991 Chevrolet Cavalier. Such assets as bank accounts and real property, which were later determined to be part of the estate, were not noted in this inventory.
[5] Joseph's concern at the time was that an $80,000 joint bank account, which was held jointly by Mrs. Morelli, Gus, and Joseph would become part of the estate to be distributed (resulting in a reduced share to Joseph). This bank account was not included in Gus's universal inventory.
[6] The number, $21,800, had been the result of Gus' calculation of the proposed sale price for the house (then $139,000) divided by five (resulting in equal shares of $25,800), less Joseph's $4000 advancement.
[7] Applying simple arithmetic (amount received minus expenses, disbursements, and the remaining real estate value), this schedule leaves estate funds at minus $9428.72.
[8] Both Residential Properties and Coleman Realtors responded that they would accept 6% but not 5%, and the amount of commission was settled at 6%.
[9] The Court notes that if the assets received were $241,475.78, and the assets paid out, listed as $51,259.21, were added together, that total would be $292,734.99 — a number still inconsistent with the summarized total.
[10] This amount constitutes a compilation of the advancement amounts reflected in the Will, namely: $25,000 for Suzanne, $2000 for Paul; $1500 for Gus, $7000 for Marie, and $4000 for Joseph.
[11] Although family compromises are historically protected by equity,Baylies v. Payson, 87 Mass. 473 (Mass. 1862), agreements and waivers made pursuant to such compromises generally function as contracts.See e.g. Carney v. Kardinal Land, 813 A.2d 50, 54 (R.I. 2003) (holding a family member to a signed waiver); Beckworth v. Beckworth, 255 Ga. 241,243 (Ga. 1985) (stating that agreements to settle property distribution under a will "are in essence solely contractual," having as their consideration the termination of family controversies). Given that such agreements function as contracts, the Court will read the contents of the waiver to determine the terms to which the parties are bound. "Contract interpretation is a question of law; it is only when contract terms are ambiguous that construction of terms becomes a question of fact. . . . In situations in which the language of a contractual agreement is plain and unambiguous, its meaning should be determined without reference to extrinsic facts or aids." Clark-Fitzpatrick,Inc./Franki Found. Co. v. Gill, 652 A.2d 440, 443 (R.I. 1994) (citations omitted).
[12] Using Gus's numbers, the share to each sibling is $38,043.31 ($190,216.57 — which is $241,475.78 minus $51,259.21 — divided by five). Then for each sibling, Gus deducts from that share amounts already paid, and that sibling's advancement.
[13] Under common law, the amount of the advancements were first added to the total assets of the estate, then the estate would be divided, and finally the advancements would be deducted from the receiving heirs shares. Jesse Dukeminier and Stanely M. Johanson, Wills, Trusts, andEstates 129 (Aspen Law and Business 2000). This traditional treatment of advancements is referred to as the hotchpot doctrine, and long served as the default method of calculating advancements in the absence of contrary intent. 80 Am. Jur. Wills 2d § 1484 (2002). Applying the traditional method in the case at hand, and using Gus's asset list for items aside from the advancements (the liquidated value of the real and personal property), the Court finds that the total would be $280,975.78 (Gus's $241,475.78 plus $39,500, representing the following advancements: $25,000 for Suzanne, $2000 for Paul; $1500 for Gus, $7000 for Marie, and $4000 for Joseph). This is Attorney Sullivan's total.
[14] Ultimately, the amount of the individual shares would be the same whether the hotchpot method is used or not.